**NATIONAL CASUALTY COMPANY, Plaintiff–Appellant,**

v.

**GREAT SOUTHWEST FIRE INSURANCE COMPANY and Hartford Accident and Indemnity Company, Defendants–Appellees.**

No. 90CA1017.

Colorado Court of Appeals, Div. V.

July 18, 1991.

Rehearing Denied Aug. 29, 1991.

Certiorari Granted Jan. 13, 1992.

Semple & Jackson, P.C., Franklin A. Nachman, Denver, for plaintiff-appellant.

Downey and Knickrehm, P.C., Kate E. Knickrehm, Thomas E. Downey, Greg A. Greenstein, Englewood, for defendant-appellee Hartford Acc. and Indem. Co.

Walberg, Dagner & Loyd, P.C., Wendelyn K. Walberg, Englewood, for defendant-appellee Great Southwest First Ins. Co.

Opinion by Judge NEY.

Plaintiff, National Casualty Company, appeals the summary judgment entered in favor of defendants, Great Southwest Fire Insurance Company and Hartford Accident and Indemnity Company. We affirm.

Plaintiff insurance company brought this action against two other insurance companies to determine their respective rights regarding defense and settlement of an underlying federal action. That lawsuit

arose from the disciplinary discharge of one of its police officers by the City of Craig, Colorado. Plaintiff and defendants had each, at some time, been insurers of the City. However, plaintiff alone undertook to defend the claim and negotiate a settlement. Plaintiff then sought to recover from defendants a portion of the settlement and the costs incurred, but the trial court granted summary judgment in favor of defendants. This appeal followed.

## I.

Plaintiff first asserts that the trial court erred in its conclusion that defendant Great Southwest had no obligation to defend the underlying lawsuit. We disagree.

Great Southwest issued a public official liability policy to the City. This policy was a "claims made" policy that provided coverage only for claims first made during the policy period, as opposed to an "occurrence" policy which provides coverage for claims which arise during the policy period.

Great Southwest's policy states:

"If, during the policy period, any claim or claims are first made against the INSUREDS as a result of any WRONGFUL ACT, the Company will pay ... in accordance with the terms of this policy, all loss which the INSUREDS shall become legally obligated to pay as damages. The Company shall have the right and duty to defend any suit from such WRONGFUL ACT, even if any of the allegations of the suit are groundless, false or fraudulent...."

A claim is considered to have been made within the policy period if the following "Notice of Claim" is provided:

"If, during the policy period ..., the PUBLIC AUTHORITY or any INSUREDS shall receive written or oral notice from any party that it is the intention of such party to hold the INSUREDS responsible for a WRONGFUL ACT and INSUREDS give written notice to the Company of the receipt of such written or oral notice within one year, then any claim which may subsequently be made against the INSUREDS arising out of such WRONGFUL ACT shall, for

purpose of this policy, be treated as a claim made during the POLICY YEAR in which such notice was given...."

Hence, for Great Southwest to incur liability under this policy, it is necessary to conclude that a claim was first made, according to the terms of the policy, during Great Southwest's policy period. The record shows that the public official liability policy purchased from Great Southwest provided coverage for the City from June 10, 1984, through February 15, 1985. The policy purchased from plaintiff provided coverage from February 15, 1985, through June 10, 1985.

In August 1984, the City notified its employee of the termination of her employment as a police officer. When the employee requested a review of her termination through the City's grievance procedures, she was placed on suspension without pay pending resolution of the grievance. At the conclusion of the grievance procedure in September 1984, the employment of the grievant was terminated.

In March 1985 (during plaintiff's policy period), the former police officer sent to the City a governmental immunity notice letter claiming injury, in the termination of her employment, from acts of the police chief, city administrator, and city council. The City thereafter notified both plaintiff and Great Southwest, indicating that the letter it had received constituted the first notice of claim. Great Southwest referred the matter to plaintiff, asserting that the claim had been first made at the time of the notice letter to the City and thus outside Great Southwest's policy period.

Plaintiff contrarily contends that the former officer's act of requesting review of her termination, in September 1984, constituted oral notice of her intention to hold the City liable for a wrongful act and that, consequently, the claim arose within Great Southwest's policy period.

While we agree with plaintiff that the events which gave rise to the claim occurred during Great Southwest's policy period, we are unpersuaded that an application to utilize a grievance procedure consti-

tutes notice of a claim within the meaning of the policy.

We do not base this conclusion upon the City's characterization of the March letter from its former employee as its first notice of claim. *See International Insurance Co. v. Peabody International Corp.*, 747 F.Supp. 477 (N.D.Ill.1990). Neither do we base our conclusion upon Great Southwest's argument that the claim did not arise until the final termination at the end of the grievance procedure in September, which was the determination of the trial court in the underlying suit.

Rather, we rely on the plain language of the policy which requires that for notice to be effective, it must advise the insured of the intention of the claimant to hold the insured responsible for a wrongful act. The filing of a grievance is merely an initiation of a dispute resolution procedure. And, to seek reinstatement is not notification of intent to hold insured responsible if reinstatement does not follow.

We agree with the trial court's conclusion that the two acts, a request for review through an established grievance procedure and sending the City a governmental notice immunity letter, are "qualitatively different. The notice letter constituted notice, the grievance procedure did not." Therefore, we conclude that, under the facts here, the underlying claim for relief was not made within the policy period of the Great Southwest policy. Consequently, Great Southwest had no obligation either to defend or to provide coverage for the underlying claim.

## II.

Plaintiff also asserts that the trial court erred in its conclusion that it could not recover from defendant Great Southwest costs of defense and settlement. We do not agree.

Plaintiff contends that the trial court's reliance, in the absence of state court authority, upon *Continental Casualty Co. v. Firemen's Fund Insurance Co.*, 403 F.2d 291 (10th Cir.1968), and *Brayman v. Northwestern Mutual Insurance Co.*, 381 F.Supp. 362 (D.Colo.1974) is misplaced and that the lack of formal contractual relations between parties does not preclude a coinsurer from recovering costs of defense and settlement. In support of this position, it cites *Forum Insurance Co. v. Ranger Insurance Co.*, 711 F.Supp. 909 (N.D.Ill. 1989). Because we have determined that Great Southwest was not an insurer at the time in question, this line of reasoning is inappropriate.

Plaintiff further contends that merely because it "elected to defend and settle the underlying litigation," Great Southwest should not be permitted totally to avoid its obligations. Plaintiff did not, however, elect to defend as a volunteer but did so because it was clearly obligated to do so under its policy. In contrast, any obligation of Great Southwest to defend ceased when its policy expired prior to notification of any claim arising under its policy.

Plaintiff also bases its demand for contribution upon the fact that the policies of plaintiff and of Great Southwest contained "other insurance" clauses which provided that in the event of other valid and collectible insurance, each respective policy would be excess to the other policy. Further, Colorado law provides that the clauses cancel themselves, and coverage and defense are afforded pro rata. *See Allstate Insurance Co. v. Frank B. Hall & Co.*, 770 P.2d 1342 (Colo.App.1989). This argument also is inappropriate here since only the policy of plaintiff was in force and Great Southwestern had ceased to be an insurer. Thus, no other valid and collectible insurance existed.

## III.

Plaintiff finally contends that the trial court erred by granting summary judgment in favor of defendant Hartford on the basis that its general liability policy covering claims for "bodily injury" did not cover damages for emotional distress. We again disagree.

Hartford issued to the City of Craig a comprehensive business policy of insurance which was in effect at the time in question.

Under the terms of that policy, Hartford agreed to pay all sums which its insured became legally obligated to pay as damages "because of bodily injury ... caused by an occurrence...." In defining "bodily injury," the policy states:

" 'Bodily injury' means bodily injury, sickness or disease sustained by any person, which occurs during the policy period, including death at any time resulting therefrom."

Bodily injury to an employee "arising out of and in course of his employment" was excluded from coverage.

In the underlying litigation, the terminated employee sought damages for emotional distress and suffering in addition to damages related to wrongful termination. No evidence of other physical manifestation was presented. To address the question of coverage for the injury which was alleged, it is necessary to decide whether the term "bodily injury" encompasses emotional distress. Though this issue is one of first impression in Colorado, it has been addressed in other jurisdictions.

Plaintiff relies primarily on *NPS Corp. v. Insurance Co. of North America,* 213 N.J.Super. 547, 517 A.2d 1211 (1986) and *Lavanant v. General Accident Insurance Co.,* 164 A.D.2d 73, 561 N.Y.S.2d 164 (1990) for its contention that emotional distress is a bodily injury. While these two cases did award damages for emotional distress under policies which insured against bodily injury, they are, nevertheless, distinguishable.

*NPS* awarded damages where the injured had been a victim of sexual harassment consisting of improper physical contact, and the court stated that it was convinced that the term "bodily injury" as used in the policy, encompassed claims for emotional distress *caused by an assault and battery.*

The *Lavanant* court awarded damages for emotional distress suffered as a result of an insured's negligence. The court concluded that the definition of "bodily injury" contained in the policy as "bodily injury, sickness or disease" was ambiguous and, as such, properly to be construed against the insurer. Accordingly, the court, in interpreting the language "not hypertechnically, but in its plain and ordinary sense," then concluded that the lay reader would consider mental anguish within the ambit of "sickness."

In spite of the reasoning advanced by these cases and others cited by plaintiff, *see Filip v. North River Insurance Co.,* 201 Ill.App.3d 351, 147 Ill.Dec. 17, 559 N.E.2d 17 (1990) (loss of consortium within coverage for bodily injury); *County of Chemung v. Hartford Casualty Insurance Co.,* 130 Misc.2d 648, 496 N.Y.S.2d 933 (1985) (pain and suffering resulting from physical child abuse constituted bodily injury); *Wolfe v. State Farm Insurance Co.,* 224 N.J.Super. 348, 540 A.2d 871 (1988) (reaffirming decision in *NPS, supra.*); *Loewenthal v. Security Insurance Co.,* 50 Md.App. 112, 436 A.2d 493 (1981) (mental anguish held to be bodily injury in absence of physical contact), the position that emotional distress is encompassed within "bodily injury" remains that of the minority.

The weight of authority is to the contrary. Faced with the term "bodily injury," courts which have interpreted this language have determined that it limits policy coverage to physical injury to the body and does not include claims for purely nonphysical or emotional distress. *See Rolette County v. Western Casualty & Surety Co.,* 452 F.Supp. 125 (D.N.D.1978). Rather than finding the term ambiguous, courts have concluded that "in giving the 'bodily injury' coverage its plain meaning, it simply does not cover [a claim] for purely emotional injury." *American & Foreign Insurance Co. v. Church Schools,* 645 F.Supp. 628 (E.D.Va.1986).

This conclusion has been reached in a variety of factual settings. *See St. Paul Fire & Marine Insurance Co. v. Campbell County School District No. 1,* 612 F.Supp. 285 (D.Wyo.1985) (emotional suffering incurred in violation of First Amendment rights); *Mellow v. Medical Malpractice Joint Underwriting Ass'n,* 567 A.2d 367 (R.I.1989) (damages incurred in invasion of privacy leading to emotional harm); *Allstate Insurance Co. v. Diamant,* 401 Mass. 654, 518 N.E.2d 1154 (1988) (dam-

ages arising out of defamation and intentional infliction of emotional distress); *E–Z Loader Boat Trailers, Inc. v. Travelers Indemnity Co.*, 106 Wash.2d 901, 726 P.2d 439 (1986) (alleged illegal discharge due to sex and age discrimination leading to emotional distress).

The case upon which the trial court here relied, *West American Insurance Co. v. Bank of Isle of Wight*, 673 F.Supp. 760 (E.D.Va.1987), was factually very similar. *West American*, too, involved a wrongful termination resulting in lost wages and emotional distress and an insurance policy which was substantially identical, in all material respects, to the Hartford policy. There, the court concluded that the plain meaning of the term "bodily injury" does not include purely emotional injury.

We also find persuasive *Allstate Insurance Co. v. Diamant, supra.* The *Allstate* court agreed with *Williams v. Nelson*, 228 Mass. 191, 117 N.E. 189 (1917) which concluded that: "[B]odily injury imports harm arising from corporeal contact. In this connection 'bodily injury' refers to an organism of flesh and blood. It is not satisfied by anything short of physical, and is confined to that kind of injury."

The *Allstate* court went on to say that: "[W]e do not find the term ambiguous," and that, as a general rule, other jurisdictions have found the term "bodily injury" to be unambiguous and understood to mean hurt or harm to the human body, contemplating actual physical harm or damage. The court then dismissed claims for emotional distress and injury to reputation.

Because we conclude, with the majority of jurisdictions, that the term "bodily injury," when given the meaning which is common to ordinary understanding and which thus embodies the reasonable expectations of the parties to the insurance contract, does not encompass purely emotional harm, we hold this to be the law in Colorado.

The judgment is affirmed.

JONES and DAVIDSON, JJ., concur.